**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MICHAEL ROACH, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-1024 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| THE SALVATION ARMY NATIONAL CORPORATION, | **CLASS ACTION** |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Michael Roach ("Plaintiff"), individually and on behalf of all similarly situated persons (the "Class" or "Class Members"), alleges the following against The Salvation Army National Corporation ("Salvation Army" or "Defendant") based upon personal knowledge with respect to Plaintiff and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION AND INTRODUCTION

1.     Plaintiff brings this class action against Salvation Army for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") from criminal hackers, including at least some of the following information, among other sensitive information: names, dates of birth, addresses, Social Security numbers, driver's license numbers, and/or other government identification card numbers.

2.     Salvation Army is a national non-profit headquartered in Alexandria, Virginia. It is part of an international organization and is an evangelical part of the universal Christian Church.

Its mission is to "preach the gospel of Jesus Christ and to meet human needs in His name without discrimination."[1] The Salvation Army is one of the world's biggest charity organizations.

3.    On or about March 28, 2025, Cybernews' dark web tracker, Ransomlooker, first noted a post by the ransomware gang Chaos, indicating that it had obtained sensitive information from Salvation Army and that the "[d]ata will be released soon"[2] (the "Data Breach").

4.    Little detail is available concerning the Data Breach and Salvation Army has failed to report the breach, notify victims, or provide any notice whatsoever regarding the information that was taken, post-breach containment, and remediation efforts that would enable breach victims to take the necessary steps to protect themselves against the harms caused by the Data Breach.

5.    While Salvation Army has not yet acknowledged the attack, Chaos very recently posted a sample of the stolen data. Based on this sample date, the information affected appears to be the PII of up to 101,000 employees and 1.4 million volunteers.

6.    Because of Salvation Army's conduct and data privacy failures, Plaintiff and Class Members are and continue to be at a significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

7.    The PII compromised in the Data Breach includes highly sensitive data, which is a gold mine for data thieves. Armed with sensitive PII, data thieves can commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members'

---

[1] *About Us,* THE SALVATION ARMY, https://www.salvationarmyusa.org/about-us/ (last visited June 12, 2025).
[2] Paulina Okunyté, *Hackers say they've snatched data from the Salvation Army*, CYBERNEWS (May 28, 2025), https://cybernews.com/security/salvation-army-ransomware-attack/.

information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

8.    Plaintiff and Class Members have suffered and remain at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their PII, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

9.    Plaintiff brings this class action lawsuit to address Salvation Army's inadequate safeguarding of Class Members' PII that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the breach, the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

10.    The potential for improper disclosure and theft of Plaintiff's and Class Members' PII was a known risk to Salvation Army, and thus Salvation Army was on notice that failing to take the necessary steps to secure the PII left the data vulnerable to an attack.

11.    Upon information and belief, Salvation Army failed to properly monitor and implement security practices with regard to the computer network and systems that housed the PII.

12.    Plaintiff seeks to remedy the harms on behalf of Plaintiff and all similarly situated individuals whose PII was accessed and/or compromised during the Data Breach.

13.    Accordingly, Plaintiff, individually and on behalf of the Class, asserts claims for negligence, negligence per se, breach of implied contract, unjust enrichment, breach of fiduciary duty, breach of confidence, and declaratory and injunctive relief.

## PARTIES

### Plaintiff

#### *Plaintiff Michael Roach*

14.     Plaintiff Michael Roach is, and at all times mentioned herein was, an individual citizen of the State of Florida.

15.     Plaintiff is a former employee of Salvation Army. Plaintiff provided PII to Salvation Army in connection with obtaining employment. In requesting, requiring, and maintaining Plaintiff's PII for its business purposes, Salvation Army impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII. Salvation Army did not take proper care of Plaintiff's PII, leading to its theft as a direct result of Salvation Army's inadequate security measures and data protection protocols.

16.     Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to maintain heightened protective measures for years, and possibly for life. This includes spending significant time on actions such as monitoring financial accounts, placing credit freezes, investigating and/or disputing fraudulent charges, and dealing with excessive spam and phishing attempts.

17.     Plaintiff has suffered actual injury from having his PII compromised as a result of the Data Breach, including, but not limited to: (a) damage to and diminution in the value of Plaintiff's confidential PII—a form of property that Plaintiff entrusted to Salvation Army, which was compromised as a result of the Data Breach; and (b) a violation of Plaintiff's privacy rights as a result of unauthorized disclosure of PII.

18.     Had Plaintiff known that Salvation Army would not adequately protect his PII, Plaintiff would not have agreed to provide Salvation Army with his PII.

4

19.     As a result of Salvation Army's failure to adequately safeguard Plaintiff's PII, Plaintiff has been injured. Plaintiff also is at a continued risk of harm because Plaintiff's PII remains in Salvation Army's systems, which have already been shown to be susceptible to compromise and attack, and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate data security measures to protect the PII in its possession.

**Defendant**

*The Salvation Army National Corporation*

20.     Defendant Salvation Army is a nonprofit corporation headquartered at 615 Slaters Lane, Alexandria, Virginia 22314.

21.     Defendant can be served through its registered agent, C T Corporation System at 4701 Cox Road, Ste. 285, Glen Allen, Virginia 23060.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and, upon information and belief, members of the proposed Class are citizens of states different from Defendant.

23.     This Court has jurisdiction over Defendant because it is headquartered in this District.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, and because Defendant resides in this judicial district.

## FACTUAL ALLEGATIONS

**A.**    **Salvation Army's Operations and Collection of Plaintiff's and Class Members' PII**

25.     Salvation Army is a nonprofit organization that operates nationally, with a mission to "to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination." It provides its services in "nearly every ZIP code across the country."[3]

26.     Salvation Army utilizes both paid employees and volunteers to carry out its mission. As a condition of becoming an employee or volunteer, Salvation Army requires that individuals entrust it with highly sensitive PII.

27.     Due to the highly sensitive and personal nature of the information Salvation Army acquires and stores with respect to its employees and volunteers, Salvation Army, upon information and belief, promises to, among other things: keep its employees' and volunteers' PII private; comply with industry standards related to data security and the maintenance of its employees' and volunteers' PII; inform its employees and volunteers of its legal duties relating to data security and comply with all federal and state laws protecting its employees' and volunteers' PII; only use and release employees' and volunteers' PII with authorization or as required by law; and provide adequate notice to employees and volunteers if their PII is disclosed without authorization.

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Salvation Army assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure and exfiltration.

---

[3] *Mission Statement*, THE SALVATION ARMY , https://www.salvationarmyusa.org/about-us/service-to-all/ (last visited June 12, 2025).

29.    Plaintiff and Class Members relied on Salvation Army to keep their PII confidential and securely maintained and to only make authorized disclosures of this information, which Defendant ultimately failed to do.

**B.    The Data Breach**

30.    Little information is available concerning the Data Breach, and Salvation Army has not acknowledged the Data Breach or provided any information to victims or the public.

31.    In late-May, the Chaos ransomware gang added Salvation Army to its list of victims. It created a post on the dark web indicating that it had obtained data from Salvation Army and that the "[d]ata will be released soon."[4]

32.    On information and belief, the information disclosed during the Data Breach includes some or all of the following information, and potentially other sensitive information: names, dates of birth, Social Security numbers, driver's license numbers, and/or other government identification card numbers of Salvation Army's employees and volunteers.

33.    To date, Defendant has either not investigated, or has simply not disclosed, crucial details like the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. These critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII is protected.

34.    Salvation Army has so far offered no substantive steps to help victims like Plaintiff and Class Members protect themselves.

---

[4] Okunyté, n.2, *supra*.

35.     Salvation Army had obligations created by implied contract, industry standards, and common law to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

36.     Plaintiff and Class Members provided their PII to Salvation Army with the reasonable expectation and mutual understanding that Salvation Army would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

37.     Salvation Army's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

38.     Salvation Army knew or should have known that its electronic records would be targeted by cybercriminals.

**C.     Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII Are Particularly Susceptible to Cyberattacks**

39.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect and store PII, like Defendant.

40.     Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

41.     In 2023, a record 3,205 data breaches occurred, resulting in approximately 353,027,892 individuals being compromised, a 78% increase from 2022.[5]

---

[5] *2023 Data Breach Annual Report*, IDENTITY THEFT RES. CTR. (Jan. 2024), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

42.    In light of recent high profile data breaches, Defendant knew or should have known that the PII it collected and maintained would be targeted by cybercriminals.

43.    As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

44.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

45.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially hundreds of thousands or millions of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

46.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

47.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

### D.    Value of Personally Identifiable Information

48.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[6]

---

[6] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[7]

49.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[8]

50.    For example, PII can be sold at a price ranging from $40 to $200.[9]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[10]

51.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—including Social Security numbers—is impossible to "close" and difficult, if not impossible, to change.

---

[7] *Id.*

[8] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[9] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[10] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 12, 2025).

52.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[11]

53.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

54.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[12]

**E.     Defendant Failed to Comply with FTC Guidelines**

55.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

---

[11] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[12] U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* at 29 (June 2007), https://www.gao.gov/products/gao-07-737.

56.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

57.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

58.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against

unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

60.     Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTCA, yet it failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

## F.     Defendant Failed to Comply with Industry Standards

61.     Experts studying cybersecurity routinely identifies entities like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

62.     Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees; strong password requirements; multilayer security including firewalls, anti-virus and anti-malware software, encryption, and multi-factor authentication; backing up data; and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

63.     Other best cybersecurity practices that are standard within entities that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training

staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

64.     Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' PII, resulting in the Data Breach.

65.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### G.     Defendant Breached Its Duty to Safeguard Plaintiff's and Class Members' PII

66.     In addition to its obligations under federal laws, Defendant owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Plaintiff and Class Members.

67.     Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer

systems and data and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.  Failing to adequately protect employees' and volunteers' PII;

    c.  Failing to properly monitor its own data security systems for existing intrusions;

    d.  Failing to adhere to industry standards for cybersecurity as discussed above; and

    e.  Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

68.    Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its computer network and systems, which contained unsecured and unencrypted PII.

69.    Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**H.    Plaintiff and Class Members Suffered Common Injuries and Damages**

70.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and

imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

### Increased and Imminent Risk of Identity Theft

71.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come as a result of the Data Breach.

72.    The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of cybercriminals that commit attacks of this type, and the Chaos ransomware group has affirmatively stated that the PII will be released "soon." Certain sample documents have already been released on the dark web, demonstrating that (1) Chaos does have the information, and (2) intends to release it.

73.    In addition to dark web exposure, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

74.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

75.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

76.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

77.     One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[13]

78.     With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[13] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBSONSECURITY (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

79.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

### *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

80.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

81.    Plaintiff and Class Members have spent, and/or will have to spend time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

82.    These efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches ("GAO Report"), in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[14]

---

[14] *See* GAO Report 07-737, n.12, *supra.*

83.     These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[15]

### *Diminished Value of PII*

84.     PII is a valuable property right.[16] Their value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyberthefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

85.     An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[17]

86.     In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[18]

---

[15] *See What to Do Right Away,* FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited June 12, 2025).

[16] *See, e.g.*, John T. Soma, et al*., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[17] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak,* LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[18] DATACOUP, https://datacoup.com/ (last visited June 3, 2025).

87.     Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive rewards for up to $60.00 a year.[19]

88.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

89.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

90.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network, which upon information and belief, amounts to hundreds of thousands or millions of individuals' PII, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

91.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

---

[19] NIELSEN COMPUTER & MOBILE PANEL, *Frequently Asked Questions*,
https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited June 12, 2025).

### I.  The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

92.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the fact that the ransomware gang has already stated its intent to do so, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes.

93.    Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

94.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action individually, and on behalf of all members of the following Classes (together, the "Class" or "Classes") of similarly situated persons:

> All individuals in the United States who were impacted by the Data Breach at Salvation Army reported on May 28, 2025.

96.    Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

97.     Plaintiff reserves the right to modify or amend the definitions of the proposed Class, before the Court determines whether certification is appropriate.

98.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

99.     **Numerosity**: The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of hundreds of thousands or millions of employees and volunteers of the Salvation Army who are geographically dispersed, including in states beyond Virginia, whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Salvation Army's records, Class Members' records, publication notice, self-identification, and other means.

100.    **Commonality**: There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a.   whether Salvation Army engaged in the conduct alleged herein;

   b.   whether Salvation Army's conduct violated the FTCA;

   c.   when Salvation Army learned of the Data Breach;

   d.   whether Salvation Army's response to the Data Breach was adequate;

   e.   whether Salvation Army unlawfully lost or disclosed Plaintiff's and Class Members' PII;

f.   whether Salvation Army failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

g.   whether Salvation Army's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h.   whether Salvation Army's data security systems prior to and during the Data Breach were consistent with industry standards;

i.   whether Salvation Army owed a duty to Class Members to safeguard their PII;

j.   whether Salvation Army breached its duty to Class Members to safeguard their PII;

k.   whether hackers obtained Class Members' PII via the Data Breach;

l.   whether Salvation Army had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.   whether Salvation Army breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.   whether Salvation Army knew or should have known that its data security systems and monitoring processes were deficient;

o.   what damages Plaintiff and Class Members suffered as a result of Salvation Army's misconduct;

p.   whether Salvation Army's conduct was negligent;

q.   whether Salvation Army's conduct was per se negligent;

r.   whether Salvation Army's conduct constitutes a breach of implied contract;

s.   whether Salvation Army was unjustly enriched;

t.  whether Salvation Army's conduct constitutes a breach of fiduciary duty;

u.  whether Salvation Army's conduct constitutes a breach of confidence;

v.  whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

w.  whether Plaintiff and Class Members are entitled to credit or identity monitoring and monetary relief; and

x.  whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

101.    Salvation Army engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

102.    **Typicality**: Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Salvation Army. Plaintiff is advancing the same claims and legal theories on behalf of Plaintiff and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

103.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

104.    **Predominance**: Salvation Army has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Salvation Army's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

105.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Salvation Army. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

106.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Salvation Army has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

107.    Finally, all members of the proposed Class are readily ascertainable. Salvation Army has access to the names and addresses and/or email addresses of the Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF
## COUNT I
### NEGLIGENCE

108.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

109.    Salvation Army knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII. Salvation Army had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

110.    Salvation Army's duty also included the responsibility to implement processes by which it could quickly detect and analyze a breach of its security systems, and give prompt notice to those affected in the event of a cyberattack.

111.    Salvation Army knew or should have known of the risks inherent in collecting the PII of Plaintiff and Class Members and the importance of adequate security. Salvation Army was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

112.    Salvation Army owed a duty of care to Plaintiff and Class Members whose PII was entrusted to it. Salvation Army's duties included, but were not limited to, the following:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession;

    b.    to protect employees' and volunteers' PII using reasonable and adequate security procedures and systems compliant with industry standards;

    c.    to have procedures in place to prevent the loss or unauthorized dissemination of PII in its possession;

d.  to employ reasonable security measures and otherwise protect the PII of Plaintiff and Class Members pursuant to the FTCA;

e.  to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f.  to promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

113.    Salvation Army's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair … practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

114.    Salvation Army's duty also arose because Defendant was bound by industry standards to protect its employees' and volunteers' confidential PII.

115.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Salvation Army owed them a duty of care to not subject them to an unreasonable risk of harm.

116.    Salvation Army, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within Salvation Army's possession.

117.    Salvation Army, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

118.     Salvation Army, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose PII was compromised.

119.     Salvation Army breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.   failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.   failing to adequately monitor the security of its networks and systems;

    c.   failing to periodically ensure that its email system maintained reasonable data security safeguards;

    d.   allowing unauthorized access to Class Members' PII;

    e.   failing to comply with the FTCA; and

    f.   failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

120.     Salvation Army acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the PII compromised in the Data Breach.

121.     Salvation Army had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Salvation Army with their PII was predicated on the understanding that Salvation Army would take adequate security precautions. Moreover,

only Salvation Army had the ability to protect its systems (and the PII that it stored on those systems) from attack.

122.    Salvation Army's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised, exfiltrated, and misused, as alleged herein.

123.    As a result of Salvation Army's ongoing failure to notify Plaintiff and Class Members regarding the Data Breach and/or what PII has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

124.    Salvation Army's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their PII, and/or loss of time and money to monitor their accounts for fraud.

125.    As a result of Salvation Army's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes.

126.    Salvation Army also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' PII and promptly notify them about the Data Breach.

127.    As a direct and proximate result of Salvation Army's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

128.    The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

129.    Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

130.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Salvation Army to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE PER SE

131.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

132.    Pursuant to Section 5 of the FTCA, Salvation Army had a duty to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiff and Class Members.

133.    Salvation Army breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

134.    Specifically, Salvation Army breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

135.    The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII (such as the PII compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Salvation Army's duty in this regard.

136.     Salvation Army also violated the FTCA by failing to use reasonable measures to protect the PII of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

137.     It was reasonably foreseeable, particularly given the growing number of data breaches of PII, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII in compliance with applicable laws would result in an unauthorized third-party gaining access to Salvation Army's networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted PII.

138.     Plaintiff and Class Members are within the class of persons that the FTCA is intended to protect, and Salvation Army's failure to comply with the FTCA constitutes negligence per se.

139.     Plaintiff's and Class Members' PII constitutes personal property that was stolen due to Salvation Army's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

140.     As a direct and proximate result of Salvation Army's negligence per se, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their PII, including, but not limited to, damages from the actual misuse of their PII and the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

141.     As a direct and proximate result of Salvation Army's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

142.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Salvation Army to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT

143.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

144.    This Count is pleaded in the alternative to Count II above.

145.    Salvation Army provides employment and volunteer opportunities to Plaintiff and Class Members. Plaintiff and Class Members formed an implied contract with Defendant regarding their employment and/or volunteer services through their collective conduct, including by Plaintiff and Class Members entrusting their valuable PII to Defendant in exchange for obtaining employment and/or volunteer opportunities.

146.    Through Defendant's retention of Plaintiff and Class Members as employees and/or volunteers, it knew or should have known that it must protect Plaintiff's and Class Members' confidential PII in accordance with its policies, practices, and applicable law.

147.    As consideration, Plaintiff and Class Members turned over valuable PII to Salvation Army. Accordingly, Plaintiff and Class Members bargained with Salvation Army to securely maintain and store their PII.

148.    Salvation Army accepted possession of Plaintiff's and Class Members' PII for the purpose of providing employment and/or volunteer opportunities to Plaintiff and Class Members.

149.    In providing their valuable PII to Defendant, Plaintiff and Class Members intended and understood that Salvation Army would adequately safeguard the PII.

32

150.     Defendant's implied promises to Plaintiff and Class Members include, but are not limited to: (1) taking steps to ensure that anyone who is granted access to PII also protect the confidentiality of that data; (2) taking steps to ensure that the PII that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the PII against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with FTCA and industry standards to make sure that Plaintiff's and Class Members' PII would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

151.     Plaintiff and Class Members would not have entrusted their PII to Salvation Army in the absence of such an implied contract.

152.     Had Salvation Army disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their PII to Salvation Army.

153.     Salvation Army recognized (or should have recognized) that Plaintiff's and Class Member's PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

154.     Salvation Army violated these implied contracts by failing to employ reasonable and adequate measures to secure Plaintiff's and Class Members' PII. Salvation Army further breached these implied contracts by failing to comply with its promise to abide by FTCA and industry standards.

155.    A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide accurate and complete PII to Salvation Army in exchange for Salvation Army's agreement to, *inter alia*, provide protection of their highly sensitive PII.

156.    Plaintiff and Class Members have been damaged by Salvation Army's conduct, including harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

157.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

158.    In light of the special relationship between Salvation Army and its employees and/or volunteers, whereby Salvation Army became a guardian of Plaintiff's and Class Members' PII, Salvation Army was a fiduciary, created by its undertaking and guardianship of the PII, to act primarily for the benefit of its employees and volunteers, including Plaintiff and Class Members. This benefit included (1) the safeguarding of Plaintiff's and Class Members' PII; (2) timely notifying Plaintiff and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where Salvation Army's employees' and volunteers' PII was and is stored.

159.    Salvation Army had a fiduciary duty to act for the benefit of Plaintiff and the Class upon matters within the scope of its relationship, in particular to keep the PII secure.

160.    Salvation Army breached its fiduciary duties to Plaintiff and Class Members by failing to: protect Plaintiff's and Class Members' PII, discover the Data Breach, inform Plaintiff and Class Members about the Data Breach, and diligently investigate the Data Breach to determine the number of Class Members affected and notify them within a reasonable and practicable period of time.

161.    As a direct and proximate result of Salvation Army's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT V
## BREACH OF CONFIDENCE

162.    Plaintiff restates and incorporates by reference all preceding paragraphs as if fully set forth herein.

163.    Plaintiff and Class Members have an interest, both equitable and legal, in the PII about them that was conveyed to, collected by, and maintained by Salvation Army and ultimately accessed and acquired in the Data Breach.

164.    Salvation Army has a special, fiduciary relationship with its employees and volunteers, including Plaintiff and Class Members. Because of that special relationship, Salvation Army was provided with and stored Plaintiff's and Class Members' PII and had a duty to maintain the PII in confidence.

165.    Individuals like Plaintiff and Class Members have a privacy interest in their PII, and Salvation Army had a duty not to disclose such matters concerning its employees and volunteers.

166.    As a result of the parties' relationship, Salvation Army had possession and knowledge of highly sensitive and confidential PII belonging to Plaintiff and Class Members, information that was not generally known.

167.    Plaintiff and Class Members did not consent nor authorize Defendant to release or disclose their PII to an unknown criminal actor.

168.    Salvation Army breached its duty of confidence owed to Plaintiff and Class Members by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of employees' and volunteers' information that resulted in the unauthorized access and compromise of Plaintiff's and Class Members' PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement adequate information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; and (g) making an unauthorized and unjustified disclosure and release of Plaintiff's and Class Members' PII to a criminal third party.

169.    But for Salvation Army's wrongful breach of its duty of confidence owed to Plaintiff and Class Members, their PII would not have been compromised.

170.    As a direct and proximate result of Salvation Army's wrongful breach of its duty of confidence, Plaintiff and Class Members have suffered and will continue to suffer the injuries alleged herein.

171.    It would be inequitable for Salvation Army to retain the benefit of controlling and maintaining Plaintiff's and Class Members' PII at the expense of Plaintiff and Class Members.

172.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT VI
## DECLARATORY AND INJUNCTIVE RELIEF, 28 U.S.C. § 2201

173.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

174.    Defendant owes a duty of care to Plaintiff and Class Members that required it to adequately secure their PII.

175.    Defendant still possesses Plaintiff's and Class Members' PII, yet it does not adequately protect the PII against the threat of another data breach.

176.    Defendant has not satisfied its obligations and legal duties to Plaintiff and Class Members.

177.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PII and Defendant's ongoing failure to address the security failings that led to such exposure.

178.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach.

179.    Plaintiff, therefore, seeks a declaration (1) that Defendant's existing data security measures do not comply with its obligations and duties of care to provide adequate data security and (2) that to comply with its obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, being ordered as follows:

> a.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;
>
> b.  ordering that Defendant engage internal security personnel to conduct testing, including audits on Defendant's systems, on a periodic basis, and ordering

Defendant to promptly correct any problems or issues detected by such third-party security auditors;

c. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

d. ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

e. ordering that Defendant audit, test, and train security personnel and employees regarding any new or modified data security policies and procedures;

f. ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any PII not necessary for provision of services;

g. ordering that Defendant conduct regular database scanning and security checks;

h. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

i. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

j. ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive PII;

k. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees'

compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

l.  requiring Defendant to meaningfully educate all Class Members about the threats they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

m.  requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of ten years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment; and

n.  such other and further relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class described above, seeks the following relief:

a.  certifying the class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b.  judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, and/or disgorgement;

c.  an order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.  an order instructing Salvation Army to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e.  an order requiring Salvation Army to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  a judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  an award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

Dated: June 16, 2025                    Respectfully submitted,

                                        _/s/ David Hilton Wise_
                                        David Hilton Wise, Va. Bar No. 30828
                                        Dylan Scout Graham, Va. Bar No. 100051
                                        **WISE LAW FIRM, PLC**
                                        10640 Page Ave., Suite 320
                                        Fairfax, VA 22030
                                        Telephone: (703) 934-6377
                                        Facsimile: (703) 934-6379
                                        dwise@wiselaw.pro
                                        dgraham@wiselaw.pro

                                        Andrew W. Ferich*
                                        **AHDOOT & WOLFSON, PC**
                                        201 King of Prussia Road, Suite 650
                                        Radnor, PA 19087
                                        Telephone: (310) 474-9111
                                        Facsimile: (310) 474-8585
                                        aferich@ahdootwolfson.com

Alyssa Brown*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
abrown@ahdootwolfson.com

*Counsel for Plaintiff and the Proposed Class*

*\*Pro Hac Vice forthcoming*